RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0149P (6th Cir.)
File Name: 02a0149p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

RICHARD CALDWELL,
     *Petitioner-Appellant,*

     *v.*

RICKY BELL, Warden,
     *Respondent-Appellee.*

No. 00-5310

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 91-01120—James D. Todd, Chief District Judge.

Argued: November 29, 2001

Decided and Filed: April 30, 2002

Before: MERRITT, NORRIS, and CLAY, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Paul R. Bottei, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Glenn R. Pruden, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Paul R. Bottei, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, David C. Stebbins, Columbus, Ohio, for Appellant. Glenn R. Pruden, OFFICE OF THE ATTORNEY GENERAL, Nashville,

Tennessee, Michael E. Moore, TENNESSEE ATTORNEY GENERAL'S OFFICE, Nashville, Tennessee, for Appellee.

MERRITT, J., delivered the opinion of the court, in which CLAY, J., joined. NORRIS, J. (pp. 11-13), delivered a separate dissenting opinion.

_____

**OPINION**

_____

MERRITT, Circuit Judge. This is another Tennessee death penalty case from the 1980's in which the State concedes constitutional error but argues that the error was harmless and that the execution should go forward. At petitioner Richard Caldwell's state trial, the jury was given an instruction to presume malice from use of a deadly weapon, which had the unconstitutional effect of shifting the burden of proof on malice onto Caldwell. We conclude that the constitutional error was not harmless and therefore REVERSE the judgment of the District Court and remand with instructions to issue the writ.

**Factual and Procedural Background**

On Friday, February 6, 1981, Tony Climer went with his parents to Moody's Disco, a community dance hall in Chester County, Tennessee. While there, he was seen talking to the petitioner, Richard Caldwell, and his son Virgil. Climer was last seen alive about 11:15 p.m., and no one saw him leave the dance hall. In the days after Climer's disappearance, petitioner gave conflicting stories about their relationship, telling the disco's owner that he did not know Climer, while telling Climer's mother that her son was in Illinois, having run off with petitioner's wife.

Seven weeks later, petitioner was arrested for public drunkenness and taken to Chester County jail. His son Virgil, who was with him, was also detained. The next morning Virgil Caldwell led law enforcement officers to an isolated

area in Decatur County where they found the partial skeletal remains of a man. That afternoon, while being interrogated by authorities, petitioner confessed to killing Climer. He told authorities that Climer had left the dance hall with him and his son. Petitioner claimed that Climer had provoked him, first, by making sexual advances toward him and his son en route to petitioner's home, and later by "slapping" whiskey into petitioner's one good eye. As a result of this provocation, petitioner said, he "went crazy" and shot Climer with a shotgun, then took Climer's body to Decatur County and burned Climer's clothing.

While petitioner's son was leading officers to the skeletal remains, other officers went to petitioner's home. There they found unidentifiable blood stains on the walls, three .410 caliber shotgun shells in the front yard, and burned fabric that was identified as having come from the shirt Climer was wearing the night he disappeared. Dental records later showed the skeletal remains were Climer's, and an autopsy revealed he was killed by two shotgun blasts to the back of the head.

At petitioner's trial, the prosecution told jurors in its closing argument that it had established "each and every element of the offense of murder in the first degree." J.A. at 356. Concerning the element of malice, the prosecution said that "not only does it come--can it come from the use of a weapon, . . ." but that "[b]lowing away a human being . . . [is] the definition, the embodiment of the word malice." J.A. at 363-64.

In jury instructions, the court told the jury that it could convict Richard Caldwell of one of four possible crimes: first-degree murder, second-degree murder, voluntary manslaughter, or involuntary manslaughter. In Tennessee, "malice" is an essential element of both first- and second-degree murder. For first-degree murder, the court gave the jury the correct definition of malice. For second-degree murder, the court instructed jurors that "[w]hen the defendant is shown to have used a deadly weapon, and death is clearly

shown to have resulted from its use, it is a presumption of law that the killing was done maliciously, that is, with the malice necessary to support a conviction of murder in the second degree." J.A. at 279.

The jury found Richard Caldwell guilty of first-degree murder and, in a separate sentencing proceeding, sentenced him to death.

Caldwell timely appealed his conviction in state court, and it was affirmed on direct appeal. *See Caldwell v. State*, 671 S.W.2d 459 (Tenn. 1984), *cert. denied*, 469 U.S. 873 (1984). He then pursued state remedies for post-conviction relief, which were denied. *See Caldwell v. State*, 917 S.W.2d 662 (Tenn. 1996), *cert. denied*, 519 U.S. 853 (1996). He filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Western District of Tennessee on October 8, 1991. The district court granted partial summary judgment in favor of the State on December 2, 1996, and granted summary judgment in favor of the State on the remaining claims on December 29, 1999.[1]

### Analysis

We review a district court's decision in a habeas proceeding *de novo*. *See Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000).[2]

---

[1] The long delay between Caldwell's filing for a writ and the district court's dismissal of his claims resulted from Caldwell's decision to pursue further state post-conviction remedies after his initial filing, which led the district court to stay habeas proceedings pending resolution of Caldwell's state claims.

[2] Although federal habeas review of a state court's decision is generally governed by 28 U.S.C. § 2254 as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (the "Act"), *see* 28 U.S.C. § 2254 (d) (1994 & Supp. VI 2001), Caldwell filed his habeas petition prior to the Act's effective date of April 24, 1996, and therefore the Act does not apply. *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997) (holding the relevant provisions of the Act do not apply retroactively).

unlawful act which may probably result in depriving a person of life," it does not necessarily indicate "an intention to kill the person actually slain."

It is unnecessary to rely on the clear logic of this language, however, because the unconstitutional presumption itself explicitly applies only to the malice necessary for second-degree murder:

When the defendant is shown to have used a deadly weapon, and death is clearly shown to have resulted from its use, it is a presumption of law that the killing was done maliciously, *that is, with malice necessary to support a conviction of murder in the second degree.*

(J.A. 279) (emphasis added). I see no reason why the jury would have had any difficulty following these instructions and understanding that the presumption applies only to second-degree murder.[1]

Given that we must presume that jurors follow instructions and the very clear language restricting the presumption to second-degree murder in these instructions, I do not think that the majority is justified in concluding that the jury applied this presumption to the elements of first-degree murder. In my view, these instructions indicate that the jury did not consider the presumption at all in reaching its verdict. Therefore, the error did not have any effect on the verdict.

For these reasons, I respectfully dissent.

---

[1] The majority itself acknowledges that there is only a "reasonable probability" that the jury ignored this limitation and applied the presumption to first-degree murder. However, as pointed out above, the presumption that a jury followed instructions can only be overcome where there is an "overwhelming probability" that it was unable to do so. *See Hofbauer*, 228 F.3d at 706.

argument that malice can come from the use of a deadly weapon created "a reasonable likelihood that jurors concluded that use of a deadly weapon raised the presumption of malice for first-degree murder as well as second-degree murder." This conclusion is problematic for two reasons. First, it is contrary to the presumption that jurors follow instructions. *See Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000). Second, it ignores the language of the instruction itself.

In determining the effect that an unconstitutional instruction has had on a verdict we are bound by the presumption that "juries follow their instructions." *Id.* This presumption can be overcome only where "there is an 'overwhelming probability that the jury will be unable to follow the court's instructions.'" *Id.* (quoting *United States v. Ford*, 872 F.2d 1231, 1239 (6th Cir. 1989)). The instructions in this case specifically distinguished the standard for the malice required for second-degree murder from the more stringent standard for the malice required for first-degree murder:

Malice is an essential ingredient of murder in the second degree and may be either express or implied.

. . . .

Therefore, the malice necessary to constitute murder in the second degree is not confined to an intention to kill the person actually slain, *as is ordinarily true in the case of murder in the first degree*, but includes an intention to do any unlawful act which may probably result in depriving a person of life. It is not so strictly a spirit of spite or malevolence toward a particular individual, *as is generally required in murder in the first degree*, but is an evil design in general . . . .

(J.A. 278) (emphasis added). This distinction logically limits the unconstitutional presumption to the more generalized malice necessary for second-degree murder and excludes it from supporting the malice necessary for first-degree murder. While use of a gun by itself manifests "an intention to do any

In a criminal trial in this country, it is an elementary principle of due process that every element of the crime must be proven by the prosecution beyond a reasonable doubt. *Sandstrom v. Montana*, 442 U.S. 510, 520 (1979). An instruction that tells a jury to presume any element of a crime without evidence is unconstitutional, for "the Fourteenth Amendment's guarantees prohibit a State from shifting to the defendant the burden of disproving an element of the crime charged." *Id.*, 442 U.S. at 527 (Rehnquist, J., concurring). The Supreme Court has made clear that an instruction that a jury should presume malice from use of a deadly weapon falls under this constitutional prohibition. *Yates v. Evatt*, 500 U.S. 391, 401-02 (1991); *Francis v. Franklin*, 471 U.S. 307, 317 (1985); *see also Houston v. Dutton*, 50 F.3d 381, 385 (6th Cir. 1995). A mandatory rebuttable presumption is equally unconstitutional. *Francis*, 471 U.S. at 317.

"The judge's instructions to the jury as to the law and how the evidence should be assessed are crucial to a fair trial. They should guide the jury's deliberations and are not mere technicalities in our legal system." *Houston*, 50 F.3d at 385. When faced with a *Sandstrom* error a court should not assume it is harmless but must review the entire case under the harmless-error standard the Supreme Court most recently expounded in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and *O'Neal v. McAninch*, 513 U.S. 432 (1995). These cases adopt the principles set out in *Kotteakos v. United States*, which held that an error is not to be deemed harmless if it had a "substantial or injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 622 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). When the reviewing court has "grave doubt" as to the harmlessness of an error, the writ should issue. *O'Neal*, 513 U.S. at 435.

Although *Brecht* was a 5-4 decision, four members of the Court deviated from the *Kotteakos* standard of assessing harmless error when they held that habeas petitioners "are not entitled to habeas relief unless they can establish that it resulted in actual prejudice." *O'Neal*, 513 U.S. at 438 (quoting *Brecht*, 507 U.S. at 637). Justice Stevens, who

joined the majority opinion but who also authored a concurring opinion, differed from the majority in that respect, and wrote separately to explicate the *Kotteakos* standard. *O'Neal*, 513 U.S. at 439 (stating that Justice Stevens agreed in part because the *Kotteakos* standard "places the burden on prosecutors to explain why . . . errors were harmless").**3**  In *O'Neal*, the Court held that, in assessing harmless error, we must follow the somewhat more restrictive approach of Justice Stevens's concurring opinion in *Brecht*, which "stated explicitly that the *Kotteakos* standard applied in its *entirety*." *See O'Neal*, 513 U.S. at 439 (emphasis in original) (noting that *Brecht* was not controlling to the extent it failed to adopt the *Kotteakos* standard in its entirety and citing with approval Justice Stevens's concurrence).

The *Kotteakos* standard is "appropriately demanding." *Brecht*, 507 U.S. at 641 (Stevens, J. concurring).

If, when all is said and done, the [court] is sure that the error did not influence the jury, or had but very sight effect, the verdict and the judgment should stand....But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

---

**3**  *See also Soffar v. Johnson*, 237 F.3d 411, 460 (5th Cir. 2000) (explaining that "the Supreme Court rejected the notion that under *Brecht*, the habeas petitioner must bear the burden of establishing whether the error was prejudicial); *Lyons v. Johnson*, 99 F.3d 499, 502 n.5 (2d Cir. 1996) ("Although *Brecht* implied that the burden of proof is placed upon the defendant, the Supreme Court later clarified in *O'Neal* . . . that if the question of prejudice is in equipoise, the writ of habeas should be granted.").

---

**DISSENT**

---

NORRIS, Circuit Judge, dissenting. The majority correctly states that the question in this case is whether the unconstitutional presumption contained in the second-degree murder instruction "considered in light of the other instructions and the trial record as a whole had a 'substantial and injurious' effect on the verdict." The Supreme Court has explained that "[t]his standard reflects the presumption of finality and legality that attaches to a conviction at the conclusion of direct review. It protects the State's sovereign interest in punishing offenders and its good-faith attempts to honor constitutional rights, while ensuring that the extraordinary remedy of habeas corpus is available to those whom society has grievously wronged." *Calderon v. Coleman*, 525 U.S. 141, 145-46 (1998) (internal quotations and citations omitted). In my view, it does not appear that the error in this case had any effect on the verdict and certainly not a substantial and injurious one.

The majority primarily relies on our decision in *Houston v. Dutton*. The instruction that we addressed in *Houston* is clearly distinguishable from the one here for two reasons. First, the instruction in this case was specifically confined to second-degree murder. In *Houston*, "the same [unconstitutional] definition of malice was used in the charge to cover first and second degree murder." 50 F.3d at 385. Second, in *Houston* we found that the instruction "probably led the jury to accept the prosecutor's theory" which we described as "doubtful" in light of the evidence presented at trial. *Id.* at 387. By contrast, the evidence in this case supports the prosecution's theory that the murder was deliberate, and it is defendant's provocation theory that is "doubtful."

Implicitly recognizing this first difficulty, the majority reasons that the prosecutor's statement during closing

incompatible, because real provocation negates the concept of malice. Once the jury was instructed to presume malice, it would have been "substantially swayed" to reject the defense's theory of the killing that there was adequate provocation to produce a verdict of manslaughter. This left it with only the prosecution's theory of the killing: that it was first-degree murder. Thus, the instruction substantially and injuriously affected the verdict, resulting in prejudice to the petitioner.

"When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." *O'Neal*, 513 U.S. at 436. We are in grave doubt about whether the unconstitutional instruction given to the jury prejudiced Caldwell's substantial rights. For the foregoing reasons, we grant petitioner's plea and remand with instructions to issue a writ of habeas corpus.[4]

---

[4]Caldwell's petition raises a number of other claims for our review. However, inasmuch as our disposition on the *Sandstrom* error will result in the issuance of the writ, we see no need to reach these other claims at this time.

*Kotteakos*, 328 U.S. at 764-65; *see also Houston*, 50 F.3d at 386 n. 1(noting that in assessing whether error is harmless, the Supreme Court has "quoted with approval" the standard from *Kotteakos* outlined above). This is the test we must apply.

Here, the jury was instructed that "[w]hen the defendant is shown to have used a deadly weapon, and death is clearly shown to have resulted from its use, it is a presumption of law that the killing was done maliciously, that is, with the malice necessary to support a conviction of murder in the second degree." J.A. at 279. As the State concedes, this instruction violated the rule laid down in *Sandstrom* and *Yates*. *See Yates*, 500 U.S. at 401-02; *Sandstrom*, 442 U.S. at 527. The question before us therefore is whether this instruction, considered in light of the other instructions and the trial record as a whole, had a "substantial and injurious" effect on the verdict. *Brecht*, 507 U.S. at 622; *Kotteakos*, 328 U.S. at 764-65, 776.

*Houston v. Dutton* is directly on point. In *Houston*, the defendant was found guilty of first-degree murder after a jury had been instructed that malice is presumed if the State proves beyond a reasonable doubt that a killing occurred, and that "the use of a weapon by the party killing . . . raises a presumption of malice sufficient to sustain a charge of Second Degree Murder." *Houston*, 50 F.3d at 385. On review we found the instruction to presume malice from these facts harmful because it prevented the jury from considering the defense's alternative theory of the killing. In *Houston* the state contended that the defendant had "executed" his victim after robbing a gas station, while the defense argued instead that he had shot the victim accidentally, in a struggle over a gun. *Id*. at 386-87. "In both law and common sense, accident and malice are conceptually incompatible." *Id*. at 386. Once jurors had been instructed to presume malice, they were unable seriously to consider the defense's theory of accident. This left the jury with only the State's theory that the killing was first-degree murder. As a result, this court held that the jury instructions were not harmless.

At Caldwell's trial, the jury was told during closing arguments that malice for first-degree murder can "come from the use of a deadly weapon," and the jury was then instructed by the court that when a killing is done with a deadly weapon, "it is a presumption of law that the killing was done maliciously, that is, with the malice necessary to support a conviction of murder in the second degree." As a result, as in the *Houston* case, there is a reasonable likelihood that jurors concluded that use of a deadly weapon raised a presumption of malice for first-degree murder as well as second-degree murder. Absent the presumption, had a member of the jury in this case entertained a reasonable doubt that the State had proved malice, the juror would have been required to acquit as to first and second degree murder. Once the faulty instruction was given, however, a conscientious juror could have entertained a reasonable doubt that the State had proved malice and still voted to convict Caldwell of murder, because the trial judge had told him to presume malice from the use of a gun and the prosecutor indicated that the State had proved all the elements of first degree murder and that malice can come from the use of a deadly weapon. The erroneous instruction given by the trial judge, coupled with the prosecutor's comment, arguably had the same effect on the jury in Caldwell's case that the instruction to presume malice from certain facts given in *Houston* had on the jury in that case. We are unable to find this "error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates*, 500 U.S. at 403.

Our dissenting colleague's argument to the contrary is unpersuasive. He argues that the jury somehow clearly distinguished between two different forms of malice — the use of a deadly weapon to kill another and the intent to kill. The jury was told that "malice" was required for both first and second degree murder, but the jury was not told that first degree murder could not be based on the presumption of malice from the use of a deadly weapon. There is no obvious common sense reason for the jury to think that the presumption of malice did not operate uniformly with respect to all forms of malice, and the prosecutor, just before the

instruction was given, had just argued to the jury to convict for first degree murder because the use of a deadly weapon is the "embodiment of the word malice." Hence most normal jurors would think that the use of a deadly weapon gives rise to the inference of intent to kill. At least it is unreasonable to think that some jurors did not believe that the use of a deadly weapon was equivalent to an intent to kill after listening to both the judge's instructions and the prosecutor's argument.

We believe the instruction did particular damage by undermining Caldwell's alternative theory of the killing based on a claim of "provocation." At trial, Caldwell's confession was admitted into evidence and his counsel conceded that Caldwell shot Climer. Caldwell contended, however, that he shot Climer in a rage after being provoked by homosexual advances and by having whiskey "slapped" in his one good eye. Caldwell's trial strategy was to convince the jury that Climer had so provoked him that the killing was not "malicious" in the eyes of the law. Manslaughter and malice are incompatible because at the time of the trial, Tennessee law defined manslaughter as the "unlawful killing of another *without malice*, either express or implied." Tenn. Code Ann. § 39-2409 (1981) (emphasis added); *see also State v. Williams*, 38 S.W.3d 532, 536 (Tenn. 2001) (discussing the distinction between murder and manslaughter under Tennessee's pre-1989 criminal code).

The unconstitutional jury instructions in effect trumped Caldwell's defense of provocation. As in *Houston*, once the instruction was given, jurors were unable fairly to consider the defense's theory of provocation leading to manslaughter because manslaughter would be inconsistent with malice and jurors had already been instructed to presume malice from use of a deadly weapon.

The State argues at pages 20-22 of its brief that this instruction was harmless because "[p]rovocation is not 'conceptually incompatible' with malice, but can readily coexist with it," since a killing from a trivial provocation can be done with malice. Malice and manslaughter are, however,