COOK, Circuit Judge,
dissenting.
In granting habeas relief, today’s majority finds a prejudicial violation of clearly established federal law in the trial court’s failure to provide a Carter instruction to the sentencing jury after the defendant pleaded guilty to the relevant criminal conduct. Yet, the Kentucky Supreme Court carefully considered petitioner’s Fifth Amendment claim in light of the same Supreme Court decisions — Carter, Estelle, and Mitchell — and rightly found that none addresses the circumstances presented here. The majority disregards that analysis, finds a violation of clearly established law, and ultimately resolves the matter in favor of speculation, worrying that the jury may have punished petitioner for failing to testify. This, despite a mountain of undisputed evidence that petitioner abducted, raped, maimed, and drowned a sixteen-year-old high school student. The court’s judgment defies AEDPA deference and the Supreme Court’s harmless-error teachings. I respectfully dissent.
I.
Petitioner argues that the Fifth Amendment required the trial court to give a Carter instruction to his sentencing jury— i.e., to instruct the sentencing jury to draw no adverse inference from his decision not to testify at the sentencing hearing. Because the appeal arises on habeas review, it turns on whether the Kentucky Supreme Court “unreasonabl[y] appli[ed] ... clearly established [fjederal law, as determined by *582 the Supreme Court of the United States,” in rejecting petitioner’s claim. 28 U.S.C. § 2254(d)(1). The majority answers in the affirmative, citing three Supreme Court decisions: Carter v. Kentucky, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981); Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); and Mitchell v. United States, 526 U.S. 314, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999). The majority overlooks, however, the Kentucky Supreme Court’s careful and correct distinguishing of those casés, both on them facts and the legal principles at stake. Kentucky’s highest court reasoned as follows:
Woodall argues that he was denied due process, his right not to testify and a reliable sentence determination when the trial judge refused to instruct the jury to draw no adverse inference from the decision of Woodall not to testify during the penalty trial. Woodall pled guilty to all of the charged crimes as well as the aggravating circumstances. The no adverse inference instruction is used to protect a nontestifying defendant from seeming to be guilty to the jury because of a decision not to testify. That is not the situation presented here. The instruction contemplated by Carter v. Kentucky, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), could not have changed the outcome of a guilty determination that the defendant acknowledged by his admission of guilt. There was no reason or need for the jury to make any additional inferences of guilt.
There is no error in this respect. Any possible error would be nonprejudicial because the defendant admitted the crimes and the evidence of guilt is overwhelming. Woodall claims that Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), extended Fifth Amendment protection and thus the Carter, supra, rule to the penalty phase of a trial. Estelle, supra, is not a jury instruction case, unlike Carter. Estelle does not cite to Carter or indicate that Carter has been extended. The factual situation in Estelle is different from that presented in this case because it involved the use of an out-of-court statement the defendant made to a government expert. The statement in that case was in regard to a psychological examination by the government prosecutors which was used against the defendant without warning in the penalty trial. Neither Carter nor Estelle involved a guilty plea. Here, Woodall admitted guilt to all charges and did not contest the facts. He was not compelled to testify so there were no words that could be used against him so as to implicate the Fifth Amendment privilege as in Estelle.
Woodall contends that Mitchell v. United States, 526 U.S. 314, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999), permits a guilty plea which . does not waive the privilege against self-incrimination at the sentencing phase. Mitchell, supra, does not apply here. In Mitchell, the defendant pled guilty to federal charges of conspiring to distribute five or more kilograms of cocaine and of distributing cocaine within 1000 feet of a school or playground. She reserved the right to contest the amount of the cocaine at the penalty phase. The amount of the cocaine would determine the range of penalties. She only admitted that she had done “some of’ the conduct charged. She did not testify. Three other codefendants did testify as to the amount of cocaine she had sold. Ultimately, the U.S. Supreme Court ruled that it would not permit a negative inference to be drawn about her guilt with regard to the factual determination respecting the circumstances and details of the crime. *583 Here, Woodall did not contest any of the facts or aggravating circumstances surrounding the crimes.
Woodall v. Commonwealth, 63 S.W.3d 104, 115 (Ky.2001), cert. denied, 537 U.S. 835, 123 S.Ct. 145, 154 L.Ed.2d 54 (2002). Only one Justice dissented from this portion of the court’s judgment. See id. at 134 (Stumbo, J., dissenting), 135 (Keller, J., dissenting on other grounds) (deeming any error in this regard harmless, “because the defendant not only pled guilty, but admitted to the aggravating circumstances”).
Because the Kentucky Supreme Court applied the correct legal standards, and the facts of this case differ materially from the circumstances of Carter, Estelle, and Mitchell, AJEDPA strictly limits our review to whether the Kentucky Supreme Court unreasonably applied rules clearly established by those cases. 28 U.S.C. § 2254(d)(1). “[CJlearly established,” in this context, confines our inquiry to “the holdings, as opposed to the dicta, of [U.S. Supreme Court] decisions as of the time of the relevant state-court decision.” Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). And “[u]nreasonable application” means “objectively unreasonable,” not simply incorrect. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (explaining that AEDPA deference requires more than clear error). Under this standard, a habeas petitioner “must show that the state court’s ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 786-87, 178 L.Ed.2d 624 (2011). In other words, we may not grant habeas relief “so long as ‘fairminded jurists could disagree’ on the correctness of the state court’s decision.” Id. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)); accord Gagne v. Booker, 680 F.3d 493, 512-14 (6th Cir.2012) (en banc plurality opinion).
AEDPA deference requires careful inspection of the distinctions highlighted by the Kentucky Supreme Court. “[Evaluating whether a rule application was unreasonable requires considering the rule’s specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.” Harrington, 131 S.Ct. at 786 (quoting Yarborough, 541 U.S. at 664, 124 S.Ct. 2140); see also Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009) (“[W]hen a Supreme Court decision does not ‘squarely address[] the issue in th[e] case’ or establish a legal principle that ‘clearly extend[s]’ to a new context to the extent required by the Supreme Court in these recent decisions, [Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008),] it cannot be said, under AEDPA, there is ‘clearly established’ Supreme Court precedent addressing the issue before us, and so we must defer to the state court’s decision.”). The majority does not suggest that any of its Fifth Amendment cases alone clearly established the trial court’s obligation to give the no-adverse-inference instruction under the circumstances of this case. Rather, it reads Carter, Estelle, and Mitchell as protecting a defendant’s Fifth Amendment privilege at all stages of criminal proceedings, regardless of whether the defendant disputes any of the incriminating evidence.
Only Carter addresses the need for a prophylactic jury instruction to protect the Fifth Amendment privilege against self-incrimination. Noting the tendency of juries to infer guilt from a defendant’s silence, Carter held that trial courts must provide a no-adverse-inference instruction *584 during the guilt phase of a criminal trial upon request. 450 U.S. at 303, 101 S.Ct. 1112. Yet, as the majority appears to recognize, Carter did not consider a defendant’s entitlement to such an instruction at post-guilt stages of criminal proceedings or the effect of a defendant’s guilty plea on that right — two variations relevant to this appeal. See id. at 289-90, 300-05, 101 S.Ct. 1112.
Estelle and Mitchell speak more directly to these issues, generally recognizing that the Fifth Amendment privilege extends to the sentencing phase of criminal trials and that a generic guilty plea does not waive this right. But importantly, neither case extended the Carter remedy — a right to a no-adverse-inference instruction' — to those specific circumstances. Estelle involved a state’s surprise use of defendant’s pre-trial statements to establish a necessary aggravating factor (future dangerousness) for capital punishment. 451 U.S. at 462-63, 101 S.Ct. 1866. The defendant made the statements at a court-ordered, pre-trial psychiatric evaluation without the benefit of Miranda warnings. The Fifth Amendment violation thus involved both the coercive nature of the interrogation procedure and the state’s use of the defendant’s unwitting pre-trial statements to establish a necessary penalty factor against him. Id. at 467-69, 101 S.Ct. 1866 (vacating the death sentence). Similarly, Mitchell found a Fifth Amendment violation where the sentencing judge admitted to drawing an adverse inference regarding a disputed aggravating factor — the amount of drugs involved' — from the defendant’s failure to rebut the government’s sentencing-hearing witnesses. Although the defendant previously pleaded guilty to a drug-conspiracy crime, she disputed the government’s drug-quantity position, which carried a heavier penalty. Because her guilty plea did not eliminate the possibility of additional punishment, the Mitchell Court found that the Fifth Anendment precluded the trial court from drawing an adverse inference from her silence. 526 U.S at 330, 119 S.Ct. 1307.
Admittedly, Estelle and Mitchell discuss the Fifth Anendment privilege in expansive terms. From Estelle:
The Fifth Anendment privilege is as broad as the mischief against which it seeks to guard, and the privilege is fulfilled only when a criminal defendant is guaranteed the right to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence.
451 U.S. at 467-68, 101 S.Ct. 1866 (internal citations and quotation marks omitted). Mitchell goes further, with the following statements:
Treating a guilty plea as a waiver of the privilege at sentencing would be a grave encroachment on the rights of defendants. ...
Where the sentence has not yet been imposed a defendant may have a legitimate fear of adverse consequences from further testimony....
The concerns which mandate the rule against negative inferences at a criminal trial apply with equal force at sentencing. Without question, the stakes are high: Here, the inference drawn by the District Court from petitioner’s silence may have resulted in decades of added imprisonment. The Government often has a motive to demand a severe sentence, so the central purpose of the privilege — to protect a defendant from being the unwilling instrument of his or her own condemnation — remains of vital importance.
*585 ... The rule against adverse inferences is a vital instrument for teaching that the question in a criminal case is not whether the defendant committed the acts of which he is accused. The question is whether the Government has carried its burden to prove its allegations while respecting the defendant’s individual rights. The Government retains the burden of proving facts relevant to the crime at the sentencing phase and cannot enlist the defendant in this process at the expense of the self-incrimination privilege....
526 U.S. at 324, 326, 329, 330, 119 S.Ct. 1307. But these statements must be read in context. Estelle involved the actual use of a defendant’s coerced statements against him. Both Estelle and Mitchell presented an adverse inference that effectively shifted the government’s burden of proving a disputed aggravating circumstance to the defendant. Accordingly, both cases involved government or court actions that penalized the defendant — by exposing the defendant to greater punishment — for exercising the Fifth Amendment privilege.
This case did not. The state did not coerce petitioner to make any statement. Nor did it seek an adverse inference or oppose petitioner’s request for a Carter instruction during the sentencing hearing. And, importantly, the state did not shift its burden of proving a disputed aggravating factor to petitioner. The state’s current opposition to habeas relief reflects the unique circumstances of Woodall’s sentencing hearing — namely, that his guilty plea admitted both the relevant criminal conduct and the required aggravating circumstances for the death penalty (rape and kidnapping), and that his sentencing position did not dispute any of these facts. Now that Woodall has been sentenced, the state has a legitimate interest in opposing Woodall’s stance on the Carter instruction. In the absence of disputed facts, Woodall’s silence would demonstrate only a lack of remorse; a Carter instruction would restrict the jury from considering that relevant fact. Considering that Mitchell expressly exempted lack-of-remorse and acceptance-of-responsibility findings from its holding, 526 U.S. at 330, 119 S.Ct. 1307, the state has good reason to believe that the Fifth Amendment did not require the Carter instruction here.
In sum, the punitive element so critical in Estelle and Mitchell — the state’s use of the defendant’s silence to impose greater punishment — is wholly absent. Cf. Lakeside v. Oregon, 435 U.S. 333, 344, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978) (explaining that “the government may not add unnecessarily to the risk taken by a defendant who stands mute”). And none of the Fifth Amendment cases cited by the majority clearly establishes the right to a Carter instruction in these circumstances.[1] The majority’s position extends the rules of those cases, and fairminded jurists may differ in the application of those rules to the facts in this case.
*586 Six Justices of the Kentucky Supreme Court, in fact, did so. The majority improperly dismisses their judgment (as well as the Report and Recommendation of the federal magistrate judge) without so much as a nod to the standard that the judgment be beyond the purview of fairminded jurists. This stance not only flouts the AEDPA standard, but also undermines the animating purposes of AEDPA deference: comity, finality, and federalism. See, e.g., Woodford v. Garceau, 538 U.S. 202, 206, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003).
Reasonable though the majority’s Fifth Amendment analysis may be, AEDPA deference precludes us from substituting our reasonable judgment for that of the state’s highest court. In my view, the Kentucky Supreme Court reasonably applied federal law.
II.
The majority compounds its error by engaging in a form of possible-harm review that verges on a presumption of prejudice. This leniency appears both in its emphasis on dicta opining about the likelihood that juries draw adverse inferences, and in its ultimate finding of a “very real risk” of prejudice. Alas, the correct harmless-error standard does not permit such speculation, and neither does the undisputed evidence of this heinous crime.
As foreshadowing of the harmless-error review to come, the court twice emphasizes a statement in Carter that “it is arguable that a refusal to give an instruction similar to the one that was requested here can never be harmless.” 450 U.S. at 304, 101 S.Ct. 1112. Yet because Carter declined to decide the issue, our decision in Finney v. Rothgerber requires us to review for harmless error. 751 F.2d 858, 864 (6th Cir.1985) (reviewing for harmless error the state court’s failure to give a Carter instruction during the persistent-felony-offender penalty phase of a criminal trial); see also Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (subjecting most constitutional claims to harmless-error review, including a prosecutor’s comment about the defendant’s exercise of the Fifth Amendment privilege); Hunter v. Clark, 934 F.2d 856, 859-60 (7th Cir.1991) (en banc) (justifying application of harmless-error review to a Carter claim by noting the more severe infraction on the Fifth Amendment privilege resolved by harmless-error review in Chapman); Richardson v. Lucas, 741 F.2d 753, 755 (5th Cir.1984) (same).[2] The majority ostensibly concedes this point.
*587 It then begins its harmless-error review on the right track, citing Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) for the standard applicable to habeas cases. From Brecht, the majority correctly defines harmful error as one “ha[ving] substantial and injurious effect or influence in determining the jury’s verdict.” Id. at 637, 113 S.Ct. 1710 (citation omitted). But then the majority offers conflicting statements from Brecht and Doan v. Carter, 548 F.3d 449, 459 (6th Cir.2008), first saying that the petitioner must establish “actual prejudice,” and then suggesting that harmless error refers only to outcomes “surely unattributable to [the alleged] error.” The majority’s conclusion — that the absence of a Carter instruction may have influenced the jury — reveals that it tips the scales in favor of the habeas petitioner.
As the majority appears to acknowledge, O’Neal v. McAninch clarified the habeas harmless-error standard announced in Brecht. O’Neal v. McAninch, 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); see also Fry v. Pliler, 551 U.S. 112, 121 n. 3, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (plurality). O’Neal explained that Brecht’s “actual prejudice” language did not burden the habeas petitioner to produce evidence of prejudice. 513 U.S. at 436-39, 115 S.Ct. 992. It did, however, acknowledge the more lenient harmless-error standard applicable to habeas cases, as compared to direct appeals. O’Neal, 513 U.S. at 438, 115 S.Ct. 992 (differentiating the Brecht standard from the “stricter” Chapman standard); see also Fry, 551 U.S. at 119-20, 127 S.Ct. 2321 (explaining that the Brecht/Chapman harmless-error dichotomy survived AEDPA’s enactment). After O’Neal, “grave doubt” became the harmfulness threshold for habeas harmless-error review. O’Neal, 513 U.S. at 435, 115 S.Ct. 992. “Grave doubt” refers to situations where, after reviewing the record, “the matter is so evenly balanced that [the judge] feels himself in virtual equipoise as to the harmlessness of the error.” Id.; see also id. at 436-37, 115 S.Ct. 992 (“[W]e think it conceptually clearer for the judge to ask directly, ‘Do I, the judge, think that the error substantially influenced the jury’s decision?’ than for the judge to try to put the same question in terms of proof burdens {e.g., ‘Do I believe the party has borne its burden of showing ... ?’).”).
Our cases follow this guidance. E.g., Ferensic v. Birkett, 501 F.3d 469, 480-81 (6th Cir.2007); Caldwell v. Bell, 288 F.3d 838, 842-43 (6th Cir.2002). Doan did not, though it still found harmless error under a stricter standard. Doan, 548 F.3d at 459 (neglecting to cite O’Neal, and instead applying the “surely unattributable” standard from Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), a case applying Chapman harmless-error review on direct appeal). We must follow the “grave doubt” method advanced in O’Neal.
With this standard, review of the record here leaves little room for doubt, let alone grave doubt. The state presented eleven witnesses and the defense fourteen. The sentencing jury heard undisputed evidence of the abduction, rape, maiming, and drowning of the victim; petitioner admitted as much by virtue of his guilty plea. Undisputed forensic evidence corroborated these facts. On the issue of remorse, the jury heard independent testimony from petitioner’s mother that, shortly after the murder, petitioner came to her house, sat in a recliner, and watched television as if nothing had happened. Petitioner even benefitted from a jury instruction (No. 1) *588 he did not deserve, which told the jurors to presume his innocence of the aggravating factors he admitted, unless the state presented proof beyond a reasonable doubt.
Conversely, the jury heard nothing about petitioner’s silence from the state or from the trial court, and we have no way of knowing whether it even noticed. Nevertheless, the majority assumes “a very real risk” that his silence “had substantial and injurious effect or influence” on the verdict. Faced with this overwhelming and undisputed evidence, why would it?
The majority faults the trial judge for drawing an adverse inference (the Mitchell mistake), but the judge did nothing more than issue a legal ruling, stating that he knew of no authority precluding a sentencing jury from considering a defendant’s lack of remorse. And even if he did draw an adverse inference, the jury who made the sentencing recommendation did not hear this statement. Petitioner correctly notes that, under Kentucky law, the sentencing jury retains the discretion to recommend a life sentence, despite the presence of aggravating factors. Yet, that fact does not make it any more likely that Woodall’s silence substantially affected the jury’s verdict.
Notably absent from the majority’s harmless-error analysis is any discussion of Finney, a case the majority cites as supporting its finding of a constitutional violation. Finney involved somewhat similar circumstances, in that the trial court refused to give a Carter instruction to the sentencing jury in a post-guilt, persistent-felony-offender hearing. There, despite finding a Fifth Amendment violation, we held that “[t]he overwhelming evidence of guilt as a persistent felony offender makes failure to give the requested instruction harmless beyond a reasonable doubt as to that issue.” Finney, 751 F.2d at 864-65 (noting that undisputed evidence established the statutory prerequisites for the sentencing enhancement). We did so, despite applying the stricter, pre-Brecht, Chapman standard, which required harmlessness “beyond a reasonable doubt.” One can only wonder how the circumstances deemed harmless beyond a reasonable doubt in Finney somehow become harmful under the more lenient “substantial and injurious effect” standard of Brecht, or even leave “grave doubt” as to harmfulness under O’Neal.
“There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation.” Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). The state expended significant resources to ensure a fair sentencing hearing for Woodall. The majority brushes that aside on supposition. Pure conjecture does not establish grave doubt. I harbor none and would deny the writ.

. The majority’s passing mention of Finney v. Rothgerber, 751 F.2d 858, 864 (6th Cir.1985) does not fit this bill for a number of reasons. First, Finney is not a Supreme Court decision and therefore not “clearly established” federal law under AEDPA. See 28 U.S.C. § 2254(d)(1); Williams, 529 U.S. at 412, 120 S.Ct. 1495. Second, the decision predates the enactment of AEDPA, and thus did not assess the state-court judgments under its deferential “unreasonable application of ... clearly established [f]ederal law” standard. And third, the court found the Fifth Amendment violation harmless under the demanding, preBrecht, Chapman rule, noting that undisputed evidence satisfied “all of the statutory requirements for guilt as a persistent felony offender.” Finney, 751 F.2d at 864-65.

. Bruno v. United States, cited by the majority, does not counsel otherwise, both because it involved a statutory privilege and statutory harmless-error review, and because it predates Chapman’s mandate of harmless-error review for most constitutional errors. Bruno v. United States, 308 U.S. 287, 293-94, 60 S.Ct. 198, 84 L.Ed. 257 (1939) (construing federal statute guaranteeing a defendant’s right to testify or remain silent to require a preemptive, no-adverse-inference instruction, and finding harmful the denial of that right).
During oral argument, petitioner’s counsel briefly suggested that the denial of a Carter instruction here constituted a "structural” error exempt from harmless-error review. See generally Brecht v. Abrahamson, 507 U.S. 619, 629, 113 S.Ct 1710, 123 L.Ed.2d 353 (1993) (differentiating between "trial error[s]” subject to harmless-error review and "structural defects” presumed prejudicial). But counsel did not make that argument in petitioner’s appellate brief {see Appellee Br. at 32-37), and therefore offers no explanation for the harmless-error review in Chapman — a case involving a more severe Fifth Amendment violation — or our decision in Finney. More recent articulations of what constitutes "structural error” do not disturb these precedents. See, e.g., Neder v. United States, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (reiterating that "most constitutional errors can be harmless” and describing "structural errors” as ”defect[s] affecting the framework within which the trial proceeds" that "de *587 prive defendants of basic protections” so as to undermine the reliability of the trial’s "determination of guilt or innocence” (internal citations and quotation marks omitted)).