*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0333p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

DAVID E. MILLER,

        *Petitioner-Appellant,*

    *v.*

ROLAND COLSON,

        *Respondent-Appellee.*

No. 09-6171

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 01-00487—Robert Leon Jordan, District Judge.

Argued: April 27, 2011

Decided and Filed:  September 13, 2012

Before:  SILER, GIBBONS, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Stephen M. Kissinger, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Knoxville, Tennessee, for Appellant. Jennifer L. Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Stephen M. Kissinger, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Knoxville, Tennessee, for Appellant. Jennifer L. Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

GIBBONS, J., delivered the opinion of the court, in which SILER, J., joined, and WHITE, J., joined in part. WHITE, J. (pp. 15–21), delivered a separate opinion dissenting from sections IV and V of the majority opinion.

_____

## OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge.  David Miller appeals the district court's dismissal of his petition for a writ of *habeas corpus* under 28 U.S.C. § 2254.

1

Miller was convicted of first-degree murder in 1982 and sentenced to death, a sentence that was upheld by the Tennessee Supreme Court. He now claims that the state improperly denied him assistance from an independent medical expert, in violation of his clearly established constitutional right under *Ake v. Oklahoma*, 470 U.S. 68 (1985). Miller also claims that the district court erred in finding that improper jury instructions given by the state court amounted to harmless error. For the reasons that follow, we affirm the decision of the district court.

## I.

On May 20, 1981, Lee Standifer, a twenty-three-year-old woman diagnosed with diffused brain damage and mild retardation, was murdered in Knoxville, Tennessee. *State v. Miller* (*Miller I*), 674 S.W.2d 279, 280 (Tenn. 1984). A medical examiner testified that Standifer had been stabbed repeatedly all over her body with both a large knife and a fireplace poker; some stab wounds were so deep (including two that pierced the ribcage) that the examiner speculated a hammer-like object had been used to drive in the knife. *Id.* at 281. The evidence suggested that a large rope was used to bind the victim's body after the murder and drag it into a wooded area. An examination also showed that Standifer had engaged in sexual intercourse shortly before her death.

The evidence at trial established the following course of events. Miller and Standifer had arranged to go on a date the night of May 20, and the two of them eventually took a cab to the house of Benjamin Thomas, where Miller was staying. *Id.* at 280. Later that evening, Thomas returned to his home and found Miller hosing the basement floor; he also found streaks of blood inside the house. *Id.* The next day, Thomas discovered Standifer's body in his backyard, as well as a blue t-shirt belonging to Miller stained with blood of the same type as Standifer's. Miller, who had left Knoxville, was apprehended in Columbus, Ohio, and transported back to Knoxville. *Id.* at 281. After waiving his *Miranda* rights, he admitted to hitting Standifer with his fist and then dragging her outside Thomas's house after she was non-responsive and not breathing. *Id.* at 281–82.

Miller was indicted for Standifer's murder on August 3, 1981. On October 19, 1981, Miller's counsel requested a psychiatric examination in order to investigate Miller's competency to stand trial. The trial court granted the motion and ordered that Miller be examined by qualified staff members at the Helen Ross McNabb Mental Health Center. The order explicitly provided the staff with two inquiries:

> The medical authorities . . . shall furnish the Court with a report of their findings and will advise the Court of their opinion as to whether the defendant is mentally ill to the extent that he cannot sufficiently understand the nature and object of the proceedings going on against him, and cannot advise with counsel in a rational manner. . . . Additionally, the medical authorities will make a determination as to whether the defendant was mentally competent and understood the nature and consequences of his act on or about May 21, 1981, and will report said findings to the Court.

Dr. George Gee, a psychiatrist at Helen Ross McNabb, prepared a letter in November 1981, which was presented to the court and shared with the government and defense counsel. The letter stated that Miller's affect and thought processes were normal, and Gee concluded that he did not believe Miller was insane at the time of the offense. *Miller v. Bell*, 655 F. Supp. 2d 838, 847 (E.D. Tenn. 2009).[1]

On December 11, 1981, Miller filed a "motion for appointment of psychiatric expert," requesting that the trial court appoint a psychiatrist at the State's expense to assist in the preparation of Miller's defense. The district court denied the motion, concluding that Miller was not entitled to a second medical expert in addition to the assistance that Dr. Gee could offer him. Miller's trial was subsequently scheduled for March 1982.

At trial, Miller's counsel argued that the circumstances of the crime were so irrational that one could infer that Miller was insane; counsel, however, introduced no expert to support the defense and instead tried to demonstrate insanity through lay

---

[1] Gee had previously evaluated Miller on June 11, 1981, before the trial court ordered a formal evaluation and before Miller was even indicted. Gee completed a written evaluation, dated June 12, 1981, which described Miller as "sociopathic but certainly mentally competent to stand trial." *Miller*, 655 F. Supp. 2d at 847. This evaluation was also submitted to the court and the parties.

testimony. The prosecution, aiming to prove Miller's sanity, called Gee to the stand and questioned him about the conclusions he drew based on his examinations. On direct examination, Gee testified that he believed Miller was sane at the time of the offense and did not suffer from a mental disease or defect. During the defense's cross-examination, Gee acknowledged that Miller disclosed during the June interview that he had previously "heard some voices, someone call[ing] his name." Gee, however, testified that Miller told him in June that these voices had stopped three months before (and therefore prior to the murder); Gee also explained that he did not consider these voices evidence of a "psychotic hallucination."[2]

The jury convicted Miller of first-degree murder and sentenced him to death. Miller appealed his conviction on multiple grounds, including the district court's refusal to provide him with an independent psychiatrist for trial. In May 1984, the Tennessee Supreme Court remanded Miller's case for resentencing on the grounds that the State had impermissibly introduced evidence of two prior arrests for rape during the sentencing phase, since Miller had never been convicted of either allegation. *Miller I*, 674 S.W.2d at 284. The court, however, affirmed Miller's conviction. *Id.*

Upon remand, Miller renewed his motion for a new trial, claiming that he was entitled to the psychiatric assistance previously requested under the United States Supreme Court's recent decision in *Ake v. Oklahoma*, 470 U.S. 68 (1985). *Ake*, according to Miller, "addressed the *exact* issue on psychiatric assistance which Mr. Miller had presented" to the trial court and on his first direct appeal. As a result, Miller claimed his conviction was predicated on a denial of his due process rights. Miller also filed a state *habeas corpus* petition making the same argument about *Ake*. The trial court denied both motions without explanation. A second jury sentenced Miller to death.

---

[2]Miller's counsel also argued that evidence of LSD use indicated that Miller lacked the requisite *mens rea* for first-degree murder. Miller's counsel introduced evidence of Miller's use of LSD on the afternoon of May 20, calling witnesses who testified to having seen Miller ingest a potent dose of the drug that could have had effects hours later. He also questioned Gee extensively about the medical effects of LSD. Gee acknowledged that a user of LSD experiences hyperactive emotional bouts or hallucinogenic reactions when under the influence of the narcotic.

On a second direct appeal, Miller asked the courts "to reconsider two issues involved in the guilt-innocent phase of the first trial, to wit, the trial judge's instruction allegedly shifting the burden of proof in violation of *Sandstrom v. Montana*, 442 U.S. 510 (1979)[,] and denial of appointment of a psychiatrist to aid defendant, allegedly in violation of *Ake*[.]" *State v. Miller* (*Miller II*), 771 S.W.2d 401, 402–03 (Tenn. 1989) (internal citations omitted). The Tennessee Supreme Court rejected Miller's appeals, concluding that "[a]ll of the issues relevant to the guilt or innocence of defendant . . . were dealt with in this Court's opinion released in 1984." *Id.* at 403. The Tennessee Supreme Court concluded that "the guilt-innocent issues were foreclosed when the 1984 opinion sustaining defendant's conviction of first degree murder became final, except such issues as are permissible in a post-conviction proceeding." *Id.* The court then affirmed the second death sentence. *Id.* at 405.

In May 2002, Miller filed a petition for a writ of *habeas corpus* under 28 U.S.C. § 2254. The district court rejected all of Miller's claims and denied the petition. Miller now appeals that denial.

## II.

We review *de novo* a district court's denial of a petition for a writ of *habeas corpus*. *Tolliver v. Sheets*, 594 F.3d 900, 915 (6th Cir. 2010). Because Miller filed his petition after April 24, 1996, it is subject to the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Carter v. Mitchell*, 443 F.3d 517, 524 (6th Cir. 2006). Under AEDPA, a writ may not be granted unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(1)–(2). "A state court renders an adjudication 'contrary to' federal law when it 'arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law' or 'decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" *Biros v. Bagley*, 422 F.3d 379,

386 (6th Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)).  "A state court unreasonably applies Supreme Court precedent 'if the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular [defendant's] case.'"  *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003) (quoting *Williams*, 529 U.S. at 407).  Factual determinations made by state courts during the underlying proceedings are presumed to be correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

### III.

Miller first argues that he is entitled to *habeas* relief because he was denied state funds to obtain assistance with his defense from an "independent mental health expert," in violation of *Ake v. Oklahoma*.  The warden asserts two defenses to Miller's *Ake* claim.  First, he alleges that *Ake* is not "clearly established Federal law" for purposes of this case.  Second, the warden argues that even if *Ake* is the controlling authority in this case, the constitutional right to psychiatric assistance, as established by *Ake*, did not entitle Miller to state funds for a second psychiatrist, when he had already been evaluated by a competent psychiatrist appointed by the trial court.[3]

### A.

The first issue before us is whether the Supreme Court's *Ake* decision is relevant at all.  The Supreme Court has clarified that under § 2254(d)(1), the relevant decision for purposes of determining "clearly established Federal law" is the last state court decision that adjudicated the claim on the merits.  *Greene v. Fisher*, 132 S. Ct. 38, 44–45 (2011).  This is because § 2254(d)(1) "requires federal courts to 'focu[s] on what a state court knew and did,' and to measure state court decisions 'against this Court's precedents *as of the time the state court renders its decision*.'"  *Id.* at 44 (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011)).  The state supreme court adjudicated the

---

[3]The warden also argued before the district court that the *Ake* holding constituted a new rule announced after Miller's conviction became final in state court and was therefore barred under *Teague v. Lane*, 489 U.S. 288 (1989).  The warden does not pursue this argument on appeal, and we therefore do not consider it.

merits of Miller's claim about psychiatric assistance in 1984, when it affirmed Miller's conviction. *Miller I*, 674 S.W.2d at 284. Although Miller raised his claim predicated on *Ake*, which was issued in February 1985, in his second set of direct appeals following his resentencing, the state supreme court very clearly declined to address the merits of his claim. *Miller II*, 771 S.W.2d at 403. The court explained that "[a]ll of the guilt-innocent issues were foreclosed when the 1984 opinion sustaining defendant's conviction of first degree murder became final, except such issues as are permissible in a post-conviction proceeding . . . . [and] such issues are never relevant at a sentence hearing or a resentence hearing." *Id.* Although a post-conviction petition would have been timely, Miller did not seek post-conviction review of his *Ake* claim. The relevant state court decision, therefore, was issued before the Supreme Court's decision in *Ake* and Miller may not rely on *Ake* as clearly established federal law.[4]

## B.

Even if we were to look past the restrictions imposed by *Greene* and address the underlying merits of Miller's claim—that is, whether *Ake* established a due process right to independent, non-neutral psychiatric assistance—Miller would still not be entitled to relief on this ground.

Miller claims that under *Ake* he was entitled to the assistance of an "independent mental health expert." In psychiatric assistance claims, "independent" has become a term of art referring to a psychiatrist assigned exclusively to assist the accused in his defense. *See, e.g.*, *Carter v. Mitchell*, 443 F.3d 517, 526 (6th Cir. 2006). In contrast, a "neutral" psychiatrist is "one whose report is available to both the defense and the prosecution." *Powell v. Collins*, 332 F.3d 376, 392 (6th Cir. 2003). In this case, the trial court provided Miller with neutral psychiatric assistance—that of Dr. Gee—but denied Miller his own hired psychiatric assistance.

---

[4]In *Miller I*, however, the Tennessee Supreme Court remanded the case for resentencing; these further proceedings, and the second set of direct appeals that resulted, meant that Miller's conviction did not become final until June 28, 1990, the date on which the United States Supreme Court denied Miller's certiorari petition to consider *Miller II*.

1.

Because Miller appeals under AEDPA, to obtain relief he must show that the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). We therefore consider whether the Supreme Court has spoken to the issue of independent psychiatric assistance.

The Supreme Court's opinion in *Ake* does not speak to psychiatric assistance retained by a defendant. Ake was arrested for murder; before trial, he was diagnosed by a neutral psychiatrist as a paranoid schizophrenic and deemed temporarily incompetent to stand trial. *Ake*, 470 U.S. at 71. After six weeks of hospitalization and medication, the trial court concluded that Ake had become competent to stand trial. *Id.* at 71–72. At that time, his counsel informed the court that he would pursue an insanity defense and "asked the court either to arrange to have a psychiatrist perform the examination, or to provide funds to allow the defense to arrange one." *Id.* at 72. The trial court denied the request, finding the Constitution did not require that an "indigent defendant receive the assistance of a psychiatrist when that assistance is necessary to the defense." *Id.*

In setting aside the conviction, the *Ake* Court held that "the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." *Id.* at 74. The *Ake* Court, however, never addressed what would constitute "access" and whether provision of a neutral psychiatrist would be sufficient.[5] Because Ake's counsel had asked for *either* an independent or neutral psychiatrist, the Court did not need to address whether assistance had to be independent. The question therefore remained an open one subsequent to the *Ake* decision.

After *Ake*, the Supreme Court passed on a chance to clarify whether due process required independent psychiatric assistance. In *Granviel v. Lynaugh*, the Fifth Circuit concluded that *Ake* was satisfied when the government provided a defendant with neutral

---

[5]While a neutral psychiatrist had previously evaluated Ake to assess his competency to stand trial, no medical professional had inquired into Ake's mental state at the time of the offense. *Id.* at 71–72.

psychiatric assistance.  881 F.2d 185, 191 (5th Cir. 1989); *see also White v. Johnson*, 153 F.3d 197, 200 n.2 (5th Cir. 1998) (treating *Granviel* as good law).  In doing so, the Fifth Circuit deviated from the decisions of other Courts of Appeals, which had held that a defendant was entitled to independent, non-neutral psychiatric assistance.  *See United States v. Sloan*, 776 F.2d 926, 929 (10th Cir. 1985); *United States v. Byers*, 740 F.2d 1104, 1114 (D.C. Cir. 1984) (*en banc*).[6]  The Supreme Court, however, declined to hear the case and resolve the circuit split, despite the urging of two justices to do so. *Granviel v. Texas*, 495 U.S. 963, 963 (1990) (Marshall, J., dissenting from denial of certiorari).

Because the Supreme Court elected not to hear *Granviel*, the circuit split over the scope of the right to psychiatric assistance remained unresolved when Miller's conviction became final in 1990.  As we have previously noted, a disagreement among the circuit courts is evidence that a certain matter of federal law is not clearly established.  *Baranksi v. Fifteen Unknown Agents of Bureau of ATF*, 452 F.3d 433, 449 (6th Cir. 2006) ("[T]his disagreement among the circuits . . . shows that the [government] did not violate clearly established law." ); *see also Narlock v. Hofbauer*, 118 F. App'x 34, 35 (6th Cir. 2004) ("At the time of the petitioner's trial . . . using a defendant's pre-*Miranda* silence as substantive evidence had not been addressed by the Supreme Court and was the subject of disagreement among the circuits.  Hence . . . there was no rule 'clearly established' by holdings of the Supreme Court that would have applied . . . ."); *Turnstall v. Hopkins*, 306 F.3d 601, 611 (8th Cir. 2002) ("When the federal circuits disagree on the application of [a Supreme Court precedent], it is difficult to say the [state] court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court.").

---

[6] Subsequent to *Granviel*, at least two other circuits have held that due process requires independent psychiatric assistance.  *Starr v. Lockhart*, 23 F.3d 1280, 1288–89 (8th Cir. 1994); *Smith v. McCormick*, 914 F.2d 1153, 1158–59 (9th Cir. 1990).  The Fourth Circuit, in contrast, recently expressed doubt regarding whether *Ake* required a court to appoint a "non-neutral expert."  *Campbell v. Polk*, 447 F.3d 270, 286 & n.5 (4th Cir. 2006).

2.

Our reading of *Ake* and the case law that subsequently interpreted it is supported by an examination of our precedent involving the issue of independent psychiatric assistance. This case law is relevant in that it reiterates the unsettled nature of a defendant's right to psychiatric assistance during the decades following *Ake*. While we cannot "rel[y] upon [our] own decision[s]" to resolve a *habeas* case before us under § 2254, *Renico v. Lett*, --- U.S. ---, 130 S. Ct. 1855, 1865–66 (2010), in this case we merely look to our precedent as "evidence" of whether "Supreme Court precedents ha[ve] clearly established a rule as of a particular time." 2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 32.3, at 1585 n.10 (5th ed. 2005); *see also Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003) ("Although only Supreme Court case law is relevant under the AEDPA in examining what Federal law is 'clearly established,' the decisions of the United States Courts of Appeals may be informative to the extent we have already reviewed and interpreted the relevant Supreme Court case law . . . ."). In this case, we feel that our own internal conflict about the scope of *Ake* evidences the reasonableness of the state court decision.

We first considered whether *Ake* demanded the appointment of an independent psychiatric expert, in the *en banc* case *Kordenbrock v. Scroggy*, 919 F.2d 1091 (6th Cir. 1990). A number of judges in *Kordenbrock* opined that access to a neutral psychiatrist did not satisfy the *Ake* right to psychiatric assistance. *Id.* at 1107–08 (plurality). Other judges, however, concluded that provision of a neutral psychiatrist did satisfy *Ake*. *Id.* at 1117–18 (Kennedy, J., dissenting) ("*Ake* merely requires that a *competent* psychiatrist be provided to assist indigent defendants, not the psychiatrist of their choice."). Both positions, however, failed to garner a majority of votes. *Id.* at 1135 (Nelson, J., concurring) (finding that "[b]ecause it appears that a[n independent] psychiatric expert will be provided on retrial, I do not think it is necessary for us to decide the issue" of whether the provision of a neutral psychiatrist satisfies *Ake*). Because the Supreme Court had also declined to hear *Granviel* the year before, the issue remained unresolved in this circuit.

Our decisions subsequent to *Kordenbrock* reached different conclusions about the constitutional right to independent psychiatric assistance. In 2003, a panel of our court concluded "that an indigent criminal defendant's constitutional right to psychiatric assistance in preparing an insanity defense is not satisfied by court appointment of a 'neutral' psychiatrist." *Powell*, 332 F.3d at 392. The same year, however, a different panel of our court deemed this language to be *dicta* and concluded *Ake* was satisfied by the appointment of a neutral psychiatrist. *Smith v. Mitchell*, 348 F.3d 177, 208 n.10 (6th Cir. 2003). In 2006, a third panel revived the *Powell* rule, noting that "this court has extended *Ake* to require an 'independent' psychiatrist rather than a neutral, court-appointed psychiatrist when a defendant's mental health is in issue." *Carter*, 443 F.3d at 526.

This examination of our own precedent indicates that, while a defendant is today entitled in this circuit to independent psychiatric assistance, this is a right that has developed in the wake of *Ake* and was not established by *Ake* itself. Even in the cases that acknowledge the right to independent psychiatric assistance, this court's decisions have framed this right as an extension of *Ake*, not as a rule established by the Supreme Court's own precedent. *See Carter*, 443 F.3d at 526 (noting *Powell* "extended *Ake*"); *Powell*, 332 F.3d at 392 ("Today, we join those *circuits* that have held that an indigent criminal defendant's constitutional right to psychiatric assistance in preparing an insanity defense is not satisfied by court appointment of a 'neutral' psychiatrist . . . ." (emphasis added)); *see also Smith*, 348 F.3d at 208 n.10 ("*Ake* did not hold that due process requires the State to provide an independent psychiatrist, merely a competent one. The [*Powell*] panel's holding is an extension of *Ake*." (internal quotation marks omitted)). And our failure to resolve the issue in *Kordenbrock* shows that the scope of *Ake* was murky even years after the Supreme Court issued its decision in that case.

The limited inquiry by the *Ake* Court, the subsequent circuit split that developed in the wake of *Ake*, the Supreme Court's decision not to resolve the circuit split, and our own conflicted jurisprudence about the constitutional right to independent psychiatric assistance all guide us to one inevitable conclusion: even if *Ake* were relevant, *Ake* did

not represent "clearly established federal law" requiring the provision of independent, non-neutral psychiatric assistance.  The Tennessee court did not act unreasonably in limiting Miller's psychiatric assistance to Dr. Gee.  We affirm the district court's decision denying Miller's petition for *habeas* relief on this ground.

IV.

Miller's second claim is that the jury instruction on the subject of malice was unconstitutional and did not amount to harmless error.[7]  This issue was addressed by the Tennessee Criminal Court of Appeals during Miller's petition for post-conviction relief. The state court found that the instructions given by the trial court impermissibly shifted the burden of proof to Miller, in violation of *Sandstrom v. Montana*, 442 U.S. 510 (1979).  *Miller v. State*, No. 03C01-9805-CR-00188, 1999 WL 1046415, at *4–5 (Tenn. Ct. Crim. App. Nov. 19, 1999).  However, applying harmless error analysis, the court concluded that the *Sandstrom* error did not compel setting the conviction aside.  *Id.* at *5.  The Tennessee Supreme Court affirmed the appellate court's decision without further comment on the *Sandstrom* issue.  *Miller v. State*, 54 S.W.3d 743, 748 (Tenn. 2001).  These decisions are entitled to AEDPA deference.

We have previously found, and the warden concedes, that the presumption-of-malice instruction given in this case violated *Sandstrom*.  *Caldwell v. Bell*, 288 F.3d 838, 841 (6th Cir. 2002); *Houston v. Dutton*, 50 F.3d 381, 385 (6th Cir. 1995).  After a jury instruction is found to be unconstitutional, the court must then conduct a harmless-error analysis.  *Caldwell*, 288 F.3d at 842.  "[A]n error is not to be deemed harmless if it had a 'substantial or injurious effect or influence in determining the jury's verdict.'"  *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).  This court, however, "may not grant [Miller]'s habeas petition . . . if the state court simply erred in concluding that

---

[7]The trial court issued the following jury instruction regarding malice:
Malice is an essential ingredient of murder, and it may be either expressed or implied. . . .  If the State proves beyond a reasonable doubt that a killing has occurred, it is presumed to be malicious unless rebutted by other facts and circumstances to the contrary. . . .  The use of a deadly weapon by the party killing, when shown, raises a presumption of malice sufficient to sustain a charge of second degree murder unless it is rebutted by other facts and circumstances to the contrary.

the State's errors were harmless; rather, habeas relief is appropriate only if the [state court] applied harmless-error review in an 'objectively unreasonable' manner." *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003).

Under Tennessee state law, malice is defined as an "intent to do harm or cause injury to another, but not necessarily to cause death." *Welch v. State*, 836 S.W.2d 586, 591 (Tenn. Crim. App. 1992). The state court concluded that the evidence presented at Miller's trial overwhelmingly showed a finding of "ill will" indicating malice:

> [t]he proof shows that [Miller] killed the victim by striking her twice with great force with a fire poker and indicates those blows were so hard they bent the poker. Prior to this, [he] had handled the victim with sufficient roughness to bruise her arms and legs. Further, [Miller] inflicted multiple lacerations of great force on the victim. The evidence clearly supports a finding of "ill will."

*Miller*, 1999 WL 1046415, at *5. This assessment seems entirely reasonable. The physical evidence presented of the killing—indicating that Standifer was killed with immense force and that some of the blows were given by using a hammer-like object to drive the knife into the victim—leads to the conclusion that the murder was committed with an intent to do harm. The government also presented Miller's post-arrest statement in which he admitted hitting Standifer. This statement indicates that at least some of the blows were maliciously inflicted.

Miller argues that harmless error cannot be proven because the evidence as to his "mental state" was in question; essentially, he tries to argue that he lacked the ability to form the requisite intent. In support, Miller points to evidence suggesting that he was under the influence of LSD and alcohol at the time of the crime. The state court dismissed this argument by noting that the jury had explicitly rejected intoxication as an affirmative defense and that the physical evidence overwhelmingly indicated evidence of malice. *Id.* Again, this assessment seems entirely reasonable. While there was testimony that Miller had taken alcohol and narcotics on the day in question, there was also testimony at trial that he appeared cogent, indicating his ability to form the requisite intent. Moreover, the physical evidence indicated that Miller had used a piece of rope

to drag the body from the house in order to hide it, had hidden his bloodied shirt in the backyard, had tried to clean up the murder scene, and had lied to Thomas, the homeowner, about the source of the blood in the house (Miller claimed he received a bloody nose in a fight).  This evidence strongly indicates that Miller was in control of his senses at the time of the crime and was aware of what was occurring; it seems exceedingly improbable that he could have "los[t] contact with reality," as Miller claims he had, and yet have acted so deliberately to hide evidence of the crime.

Based on these facts, it was reasonable for the state court to conclude that the evidence of Miller's intoxication was insufficient for a jury to conclude that he lacked the intent to kill or seriously injure.  It was therefore also reasonable for the state court to conclude that the court's errant jury instruction regarding malice was harmless.  As a result, the district court was correct to reject Miller's petition for *habeas corpus* on this ground.

V.

For the reasons stated above, we affirm the decision of the district court, and Miller's petition for the writ of *habeas corpus* is denied.

-------------------

## DISSENT

-------------------

HELENE N. WHITE, Circuit Judge, dissenting. Because I am unable to conclude that the *Sandstrom*[1] error was harmless, I respectfully dissent from sections IV and V of the majority opinion.

During Miller's trial, the court instructed the jury with respect to first- and second-degree murder as follows:

> The indictment in this case charges the defendant with the offense of murder in the first degree. This charge, however, embraces four distinct, felonious homicides, namely: Murder in the first degree; murder in the second degree; voluntary manslaughter; and involuntary manslaughter.
>
> ...
> An individual commits murder in the first degree, as charged in this case, if he commits a willful, deliberate, malicious and premeditated killing.
>
> For you to find the defendant guilty of murder in the first degree, the State must prove beyond a reasonable doubt:
>
> (1) That the defendant unlawfully killed the alleged victim.
> (2) That the killing was malicious.
> (3) That the killing was willful. This means that the defendant must have intended to take the life of the alleged victim.
> (4) That the killing was deliberate; that is, with cool purpose.
> (5) That the killing was premeditated, premeditation being the principal element of this offense. This means that the intent to kill must have been formed previous to the act itself.
> ...
> If you find from your consideration of all the evidence that the State has proven each of the elements of first degree murder beyond a reasonable doubt, then you should find the defendant guilty of first degree murder.
>
> If on the other hand you find that the State has not proven each of the elements of first degree murder beyond a reasonable doubt, then you will proceed to inquire whether the defendant is guilty of the lesser included offense of murder in the second degree.

-------------------

[1] *Sandstrom v. Montana*, 442 U.S. 510 (1979).

An individual commits murder in the second degree if he commits a malicious killing. For you to find the defendant guilty of the lesser included offense of murder in the second degree, the State must prove beyond a reasonable doubt:

(1) That the defendant unlawfully killed the alleged victim.
(2) That the killing was malicious.

Malice is an essential ingredient of murder, and it may be either express or implied. Express malice is actual malice against the party slain. Implied malice is not malice against the slain, but malice in general, or that condition of mind which indicates a wicked, deprived and malignant spirit, and a heart regardless of social duty and fatally bent on mischief.

*If the state proves beyond a reasonable doubt that a killing has occurred, it is presumed to be malicious unless rebutted by other facts and circumstances to the contrary.*

...
*The use of a deadly weapon by the party killing, when shown, raises a presumption of malice sufficient to sustain a charge of second degree murder, unless it is rebutted by other facts and circumstances to the contrary.*

You should look to all the facts and circumstances developed by the evidence in this case to determine whether the State has proved beyond a reasonable doubt the existence of malice.

(Emphasis added).

The government concedes that the italicized instruction, which allowed the jury to presume the element of malice, is erroneous.[2] Miller sought post-conviction relief in the Tennessee Court of Criminal Appeals based on the *Sansdstrom* error on three grounds: 1) there was no evidence of his ill will in general or specifically towards the victim; 2) evidence of intoxicants negated the specific intent of express malice; and 3) evidence of insanity raised a jury question about Miller's specific intent. *Miller v. State*, 1999 WL 1046415, at *4 (Tenn. Crim. App. Nov. 19, 1999). That court rejected Miller's arguments for the following reasons:

---

[2]This type of erroneous instruction is commonly referred to as a *Sandstrom* error.

On the petitioner's previous direct appeal to our state's Supreme Court, that Court found "no evidence introduced by either the State or the defendant sufficient to raise a reasonable doubt as to defendant's sanity, unless it be said that atrocious, brutal acts inflicted upon Standifer [the victim], in and of themselves, were sufficient to do so." *State v. Miller*, 674 S.W.2d 279, 282 (Tenn. 1984). Further, the trial court approved the jury verdict rejecting intoxication as negating premeditation, and the Supreme Court found no reason to overturn that finding. *See id.* at 282-83.

We are also not persuaded by the petitioner's assertion regarding ill will. "Malice has been defined as an intent to do harm or cause injury to another," *Welch v. State*, 836 S.W.2d 586, 591 (Tenn. Crim. App. 1992), and the evidence clearly supports finding of such intent. The proof shows that the petitioner killed the victim by striking her twice with great force with a fire poker and indicates those blows were so hard they bent the poker. Prior to this, the petitioner had handled the victim with sufficient roughness to bruise her arms and legs. Further, the petitioner inflicted multiple lacerations of great force on the victim. The evidence clearly supports a finding of "ill will."

*Id.* at *5.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the pertinent question is whether the foregoing analysis by the Tennessee Court of Criminal Appeals was either contrary to, or an unreasonable application of, the Supreme Court's harmless-error standard outlined in *Chapman v. California*, 386 U.S. 18, 24 (1967). *See Wilson v. Mitchell*, 498 F.3d 491, 503 (6th Cir. 2007). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). In this Circuit, a finding that the error had a substantial and injurious effect or influence in determining the jury's verdict necessarily means that the state court unreasonably applied the harmless error standard. *Wilson,* 498 F.3d at 503. Additionally, "[e]ven if there is only grave doubt about whether a trial error of federal law has substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." *Campbell v. Bradshaw*, 2012 WL 913788, at *14 (6th Cir. Mar. 20, 2012) (internal quotation and citations omitted). "To determine the effect of

an error, the question to be answered is 'whether the guilty verdict actually rendered in this trial was surely unattributable to that error.'"  *Doan v. Carter*, 548 F.3d 449, 459 (6th Cir. 2008) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)).

I first note that although the Tennessee Court of Criminal Appeals correctly determined that *Sandstrom* errors are subject to harmless-error analysis, *see Miller*, 1999 WL 1046415 at *4, the court performed no such analysis.  For Miller's first two arguments, the court simply cited the reasoning of the Tennessee Supreme Court over a decade earlier with no discussion of harmlessness.  With respect to Miller's argument regarding ill will, the court utilized a sufficiency-of-the-evidence analysis without considering whether the erroneous presumption had any effect on the jury's verdict.  We have previously rejected the contention that sufficient evidence as to a particular element automatically renders an erroneous jury instruction harmless.  In *Houston v. Dutton*, notwithstanding the fact that the circumstantial evidence supported an inference of premeditation and deliberation, we explained:

> The fact that the evidence was sufficient to allow a jury to convict, of course, does not end the matter.  The judge's instructions to the jury as to the law and how the evidence should be assessed are crucial to a fair trial.  They should guide the jury's deliberations and are not mere technicalities in our legal system.  Errors in such matters may go to the heart of the question of guilt.

50 F.3d 381, 385 (6th Cir. 1995).

The defendant in *Houston* stood trial in a Tennessee state court for the murder of a gas-station attendant during a robbery.  The defendant claimed that the shooting was an accident that occurred when the defendant and victim were both struggling for the gun.  The court gave the same erroneous instruction at issue in this case.  During closing argument, the prosecutor stated that:

> [A]nybody that goes down there and arm robs a human being with a deadly weapon and then shoots them in whatever fashion is guilty of First Degree Murder, of premeditated, malicious, deliberate, willful, unlawful premeditated murder.

The defendant was convicted of first-degree murder. On habeas review, we rejected the State's contention that because the jury had independently found the elements of premeditation, deliberation and willfulness, all elements inconsistent with accident, the *Sandstrom* error was harmless. Instead, we agreed with the defendant's argument that:

> [T]he malice instruction had the effect of telling the jury to presume that the killing was subjectively contemplated beforehand-and thus that the killing was *not* accidental—[which] utterly wiped out [the defendant's] single and, on the evidence, substantial *accident* defense. Because accident would have negated not only malice but also willfulness, premeditation, and deliberation, removing the accident defense unconstitutionally left [the defendant] with *no* defense, and paved the way to a finding of all four mental elements.

*Houston*, 50 F.3d at 386.

We also had an opportunity to consider the harmlessness of a similar instruction in *Caldwell v. Bell*, 288 F.3d 838 (6th Cir. 2002). In *Caldwell*, the defendant confessed to shooting the victim but claimed he was provoked and "went crazy" because the victim made homosexual advances toward him and slapped whiskey into his eye. The jury was given an erroneous presumption-of- malice instruction that read, "[w]hen the defendant is shown to have used a deadly weapon, and death is clearly shown to have resulted from its use, it is a presumption of law that the killing was done maliciously, that is, with the malice necessary to support a conviction of murder in the second degree." *Id.* at 843. During closing argument, the prosecutor stated with respect to malice that "not only does it come—can it come from the use of a weapon, . . ." but that "[b]lowing away a human being . . .[is] the definition, the embodiment of the word malice." We concluded that erroneous instruction was not harmless because:

> Once the jury was instructed to presume malice, it would have been 'substantially swayed' to reject the defense's theory of the killing that there was adequate provocation to produce a verdict of manslaughter. This left it with only the prosecution's theory of the killing: that it was

first-degree murder.  Thus, the instruction substantially and injuriously affected the verdict, resulting in prejudice to the petitioner.[**3**]

During his trial, Miller argued both that the State had not proven the element of premeditation and that the LSD that he ingested hours prior to the killing negated any intent to kill Standifer.  In closing argument, the prosecutor stated:

> When you talk about malice, what would it take?  As the pathologist said, consistent with the jaw injury and the heart injury, what would it take for somebody to take a hammer that's found near the clothes of the victim, to take this hammer and to drive a sharp object into a person's body?  What type of mind would that take?  I don't know.  But I contend to you that it took the mind of an obsessed killer.  David Earl Miller, not only has the grand jury indicted you for first-degree murder, but the evidence in this case clearly shows your guilt and you must suffer the consequences.
>
> ...
> And, ladies and gentlemen, those are the factors that I ask you to look at very closely.  And I've attempted to illustrate to you the evidence as I see it in the case very fairly . . . I think that's what you'll find the evidence to be.  And that's what we mean when we say premeditation, willful, deliberate, and malicious killing.

Although the prosecutor vigorously advocated for a first-degree murder conviction on the basis that  Miller had the mind of an "obsessed killer," Miller's state of mind was a highly contested issue throughout the trial with considerable evidence supporting Miller's defense of intoxication.   After closing argument, the jury received its instructions.  As in *Houston*, once the jury received the erroneous instruction it no longer had to consider whether the evidence demonstrated Miller had the mind of an obsessed killer.  Rather, the jury could just presume that Miller's state of mind encompassed the actual intent to harm Standifer or a "condition . . . which indicates a wicked, deprived and malignant spirit, and a heart regardless of social duty and fatally bent on mischief." In *Caldwell* we pointed out that:

---

[**3**]Although neither *Houston* or *Caldwell* required us to use the deferential standard of review in AEDPA, both cases were analyzed under the *Brecht* "substantial and injurious effect or influence" harmless error standard and thus are pertinent to our review here. *See Fulcher v. Motley*, 444 F.3d 791, 822 (6th Cir. 2006) ("This Court has held that the *Brecht* standard survived the enactment of AEDPA").

> [T]he prosecutor, just before the instruction was given, had just argued to the jury to convict for first degree murder because the use of a deadly weapon is the "embodiment of the word malice." *Hence most normal jurors would think that the use of a deadly weapon gives rise to the inference of intent to kill. At least it is unreasonable to think that some jurors did not believe that the use of a deadly weapon was equivalent to an intent to kill after listening to both the judge's instructions and the prosecutor's argument.*

288 F.3d at 844 (emphasis added).

Similarly, because the prosecutor in this case intertwined the other elements of first-degree murder into his closing discussion of malice there is a strong likelihood that once the jury was told to presume malice from the killing itself and Miller's use of a deadly weapon, it presumed the other elements of first-degree murder as well. In addition to preventing the jury from considering Miller's argument that the State had not proven premeditation, with intent already presumed, the jury no longer needed to consider whether Miller lacked the capacity to form the requisite intent due to his intoxication. The presumption thus effectively foreclosed Miller's primary defenses. Under these circumstances, I conclude that the *Sandstrom* error had a substantial and injurious effect on the jury's verdict. For that reason, I would reverse the judgment of the district court and grant Miller's habeas petition.