NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0573n.06

No. 11-6156

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Jun 13, 2013*
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ANDRE MAYFIELD, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| JIM MORROW, | ) | THE MIDDLE DISTRICT OF |
| | ) | TENNESSEE |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

Before:  GRIFFIN and KETHLEDGE, Circuit Judges; and ZATKOFF, District Judge.[*]

KETHLEDGE, Circuit Judge.  A Tennessee jury convicted Andre Mayfield of raping two women.  After the state denied his direct appeal and his post-conviction petition, Mayfield petitioned the federal district court for a writ of habeas corpus.  The district court denied the petition.  We affirm.

I.

In 1993, Mayfield pled guilty to three counts of aggravated rape and one count of aggravated robbery for the rapes of Clara Bumphus and Rosheka Alexander.  A Tennessee trial court sentenced him to concurrent terms of twenty years for each count of aggravated rape and ten years for the

---

[*]The Honorable Lawrence P. Zatkoff, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

aggravated-robbery count. The trial court, as part of Mayfield's sentence, also provided that he would be eligible for parole after serving 30% of his time.

Six years later, Tennessee's Assistant Attorney General informed Mayfield and the trial court that Mayfield's sentence might be illegal because Tennessee law does not allow the State to parole persons convicted of more than one rape. *See* Tenn. Code Ann. § 39-13-523. Because of that law, the Tennessee Department of Corrections had already designated Mayfield as parole-ineligible. Thereafter, Mayfield filed a motion to withdraw his plea, arguing that the Department of Corrections violated the terms of his plea agreement by requiring him to serve his entire sentence. The trial court granted the motion. The State then tried Mayfield on kidnapping, rape, and robbery charges.

During the trial, Clara Bumphus testified that, on October 24, 1992, she was walking home through an alley when a man (whom she later identified as Mayfield) approached her from behind and placed a gun to her side. Upon feeling the gun, she told him: "Please don't hurt me. . . Please don't kill me because I have children." Mayfield forced her into an abandoned house and said: "Shut up. Don't look at me. I'll hurt you. . . . I'll kill you." He ordered her to lie on the floor. He then removed her underclothes and vaginally raped her with his penis. While raping Bumphus, Mayfield continued to point the gun at her face. When he finished raping her, Mayfield emptied Bumphus's purse onto the floor and took $51. He then escorted her to a nearby bus stop and let her go.

Bumphus testified that Mayfield had not disguised his appearance when he attacked her and that she therefore "remembered his face clearly." *State v. Mayfield* (*Mayfield I*), No. M1999-02415-CCA-R3-CD, 2001 WL 637700, at *2 (Tenn. Crim. App. June 11, 2001). She recalled giving the

police a detailed description of her attacker's appearance so that they could create a composite drawing of him. The State introduced the drawing as evidence at trial. She also stated that she identified Mayfield as her attacker during a police line-up.

The second victim, 17-year-old Rosheka Alexander, testified that, on October 28, 1992, a man on a bike approached her while she was walking home from a friend's house. Alexander later identified that man as Mayfield. After chatting with her briefly, Mayfield "pulled out a gun" and threatened to "blow her brains out" if she did not follow him. *Id.* at *3 (internal punctuation omitted). He took her down an alley to an empty house. Before they entered the house, Alexander tried to run away. She was unable to escape, however, because Mayfield "grabbed her from behind, put the gun against her back, and told her that if she tried to run again, he was going to blow her brains out." *Id.* (internal punctuation omitted). Mayfield then dragged her into the house.

According to Alexander, once they were in the house, Mayfield "threw her on the carpet, forced her to remove her skirt, and raped her vaginally with his penis." *Id.* (internal punctuation omitted). After the rape, while she was crying, Mayfield asked whether he broke her virginity. When Alexander said yes, Mayfield appeared pleased and "got back on [her]." *Id.* Alexander tried to escape by telling Mayfield that she saw someone at the window. But when pressed by Mayfield, she admitted that she had not seen anyone. This angered Mayfield and he "started choking [her] . . . [and] slapping [her] head on the floor." *Id.* Mayfield eventually left, but before doing so he handed her a piece of paper "on which he had apparently written his name and phone number." *Id.*

Like Bumphus, Alexander testified that Mayfield did not attempt to disguise his appearance when he raped her, and that she was therefore able to look at his face. Alexander recalled that her attacker "had gold on his teeth." She helped the police create a composite drawing of her attacker, which the State introduced as evidence. Prior to trial, Alexander identified Mayfield as her attacker during both a photograph line-up and a physical one. During the trial, Alexander also identified Mayfield as the man who had raped her.

The jury found Mayfield guilty. The court sentenced him to fifteen years for each of the two aggravated kidnappings, fifteen years for the aggravated robbery, twenty years for the aggravated rape, and fifteen years for the rape. The court ordered some of the sentences to run concurrently and others consecutively, resulting in an effective sentence of 50 years.

Mayfield appealed, and the Tennessee Court of Criminal Appeals affirmed. *See id* at *1. Proceeding pro se, Mayfield thereafter filed a number of legal actions contesting his conviction and sentence, including two petitions for state post-conviction relief. The Tennessee Court of Criminal Appeals denied relief. Mayfield later filed a petition for federal habeas relief under 28 U.S.C. § 2254, which the district court denied. This appeal followed.

## II.

We review de novo a district court's denial of a petition for a writ of habeas corpus. *Miller v. Colson*, 694 F.3d 691, 695 (6th Cir. 2012). A prisoner is not entitled to habeas relief if he has procedurally defaulted a claim (absent good cause) or if the state court has adjudicated his claim on the merits and the state court's decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. 28 U.S.C. § 2254(d).

Mayfield first challenges the State's refusal to consider him parole eligible after he served 30% of his sentence. Mayfield contends that the Fourteenth Amendment's Due Process Clause sets temporal limits on a State's ability to change a prisoner's sentence. The State responds that Mayfield procedurally defaulted this claim because he did not fairly present it to the state court and thus did not exhaust his state-court remedies. *See Whiting v. Burt*, 395 F.3d 602, 612 (6th Cir. 2005).

"The extent to which th[is] claim[] is procedurally defaulted is a nettlesome question; the extent to which [it is] meritless, much less so." *Storey v. Vasbinder*, 657 F.3d 372, 380 (6th Cir. 2011) (internal quotation marks omitted). So we cut to the merits here.

Mayfield argues that, although (according to him) he fairly presented his due-process claim to the Tennessee Court of Criminal Appeals, that court did not adjudicate the claim on the merits, which means that we should not defer to its decision under AEDPA. Mayfield notes that the Tennessee Court of Criminal Appeals only explicitly addressed whether the trial court had jurisdiction, under state law, to allow Mayfield to withdraw his guilty plea. *See Mayfield v. State (Mayfield II)*, No. E2005-00138-CCA-R3-HC, 2005 L 178636, at \*4 (Tenn. Crim. App. May 17, 2005). A state court is presumed to have adjudicated on the merits, however, all of a petitioner's fairly presented federal claims even if the court only expressly addressed the petitioner's state-law claims. *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013). And Mayfield has not rebutted this presumption. We therefore apply AEDPA's deferential standard of review. *Id.*

As for the merits of this claim, there is no clearly established Supreme Court precedent which holds that a State violates due process by changing a prisoner's release-eligibility date in accordance with state law. Moreover, Mayfield's suggestion that the state trial court violated due process by

modifying his sentence is belied by the record. Mayfield withdrew his guilty plea before the trial court had an opportunity to modify his original sentence. Rather than modify that sentence, therefore, the trial court imposed a new one after Mayfield went to trial. Thus, Mayfield cannot show that the Tennessee Court of Appeals' rejection of his due-process claim was contrary to, or an unreasonable application of, "clearly established" Supreme Court precedent.

Mayfield next claims that the State deprived him of his right to a fair trial by denying his motion to sever the Bumphus and Alexander rape counts. Here too, we cut to the merits.

Mayfield argues that this claim should also be reviewed de novo. But he has again failed to rebut the presumption that the Tennessee Court of Criminal Appeals adjudicated this claim on the merits. Thus, we apply AEDPA's deferential standard of review.

Mayfield does not allege that the Tennessee Criminal Court of Appeals' decision was contrary to, or an unreasonable application of, any Supreme Court case. The one Supreme Court case he does cite—*United States v. Lane*, 474 U.S. 438 (1986)—addresses the failure to sever criminal charges in dicta only. *Id.* at 446 n.8. And "clearly established Federal law" for purposes of § 2254(d)(1) refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Thus, as to Mayfield's severance claim, *Lane* does not clearly establish anything. *See Carey v. Musladin*, 549 U.S. 70, 74 (2006). We therefore reject this claim as well. *See Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005).

Finally, Mayfield challenges the Tennessee Court of Criminal Appeals' determination that the State did not violate *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose allegedly exculpatory evidence. A *Brady* violation occurs when a state "withholds evidence that is favorable

to the defense and is material to the defendant's guilt or punishment." *Smith v. Cain*, 132 S. Ct. 627, 630 (2012). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The allegedly exculpatory evidence here is a police report regarding Alexander's rape. The report contains a checklist of suspect characteristics, and includes checkmarks indicating that the rapist wore a "cloth-partial" mask and that he stuttered. The officer who completed the report also wrote under the "visible body scars" list that the rapist had a "scar on mouth[.]" R. 26-5 at 3.

Mayfield contends that the report is material because it suggests that someone else raped Alexander. He notes that, unlike the attacker described in the report, he does not stutter or have a scar on his mouth. The report is also material, according to Mayfield, because it calls Alexander's veracity into question—contrary to the report, she testified that her assailant was not wearing a mask. The Tennessee Court of Criminal Appeals disagreed. It concluded that the report was not material because Mayfield had not shown that, had he "been privy to the police report prior to trial, the evidence may have resulted in a different judgment." *Mayfield v. State (Mayfield III)*, No. M2009-02640-CCA-R3-CO, 2010 WL 4545822, at *6 (Tenn. Crim. App. Nov. 12, 2010). In reaching that conclusion, the court detailed the "overwhelming" evidence of Mayfield's guilt, including his fingerprints at the crime scene, the victim's identification of him during both an in-person and photographic line-up, and the composite drawing of the attacker. *Id.*

Mayfield argues that the Court of Criminal Appeals' decision was contrary to *United States v. Bagley*, *supra*. According to Mayfield, when a court reviews a *Brady* claim, *Bagley* requires the

court to consider whether there is a "reasonable probability" that, had the undisclosed evidence been available, the result of the trial would have been different. The Court of Criminal Appeals did not specifically reference *Bagley*'s "reasonable probability" language. Therefore, Mayfield reasons, the Court of Appeals' decision was contrary to *Bagley* and *Brady*.

But a state court decision is not "contrary to" federal law simply because it fails to reference a particular standard. *Early v. Packer*, 537 U.S. 3, 8 (2002). Instead, relief under the "contrary to" prong is only warranted when a state court's decision either "applies a rule that contradicts the governing law set forth" in a Supreme Court case or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court's] and nevertheless arrives" at a different result. *Id.* Neither of those situations occurred here.

The state court's rejection of Mayfield's claim is consistent with the Supreme Court's decisions in both *Bagley* and *Brady*. Even if the police had turned over the report to Mayfield, there is not a reasonable probability that the result of Mayfield's trial would have been different. Bumphus and Alexander each identified Mayfield on multiple occasions as their attacker. Bumphus testified that she was raped at midday and that she saw Mayfield's face clearly. Mayfield's fingerprints were found at the scene of Alexander's rape. And each victim helped the police create a composite image of their attacker that the State introduced at trial. Thus, even if the report would have called into question Alexander's ability to recall her attacker, the jury had a chance to test her recall by considering the composite drawing she helped the police create. Given the State's evidence against Mayfield, the state court's determination that the report's disclosure would not have changed the

outcome of the trial was not "beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011).

Moreover, contrary to Mayfield's argument before us, this case is distinguishable from *Kyles v. Whitley*, 514 U.S. 419 (1995). The evidence withheld there was much more exculpatory than the evidence withheld here. In *Kyles*, the petitioner was convicted of murder based primarily on the accounts of four eyewitnesses. But the State withheld multiple pieces of evidence that strongly suggested that another man—the man who implicated Kyles—had actually committed the murder. In addition, the defense's theory all along was that the other man—Beanie—had committed the murder. Kyles could have used the withheld evidence to show that the lead detective was "either less than wholly candid or less than fully informed[.]" 514 U.S. at 453. The State also withheld evidence that one of its two best eyewitnesses initially gave a description that matched Beanie, and that another eyewitness had been coached by the prosecution. And the withheld evidence showed that the initial descriptions given by the four eyewitnesses were inconsistent with each other.

Here, in contrast, the withheld evidence did not suggest that another potential suspect committed the rapes. Nor was that evidence the only way for the jury to test Alexander's recollection. As explained above, the State's case against Mayfield was strong. The state court thus reasonably concluded that the withheld report would have done little to undercut it.

Mayfield also argues that the Tennessee Court of Criminal Appeals' decision was based on an unreasonable determination of the facts. In particular, he challenges the state court's finding that "the assailant gave Ms. Alexander a piece of paper on which he had written his name and phone number." *Mayfield III*, 2010 WL 4545822, at *6. The evidence presented to the state court included

Alexander's testimony that her attacker handed her a piece of paper with his name and number on it. *See* R. 72-3 at PageID# 1206 ("he handed me a piece of paper with his number on it, and I didn't want it"); *id.* at PageID# 1233–34 ("A: You stated that he gave you a note?  A: Correct.  Q: And it had his name or his nickname on it, correct?   A: Correct.").   Based on this evidence, it was reasonable for the state court to conclude that Alexander's attacker had given her a piece of paper with his name and phone number.  Thus, this argument is meritless.

The district court's judgment is affirmed.